IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| JANE DOE NO. 1, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 2:24-cv-00175-RAH |
| ) | [WO] |
| ) | |
| RAJVEER LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION AND ORDER**

Five sex trafficking victims sue for relief under the Trafficking Victims Protection Reauthorization Act ("TVPRA" or "Act"), specifically 18 U.S.C. § 1595(a). They name seven companies that own and operate hotels where the victims were trafficked. Four of the five victims, Jane Does 1, 2, 4, and 5, bring claims under the TVPRA against M & S Hotels, LLC ("M&S").[1] Doe 2, who was a minor at the time, also brings a state-law claim against M&S.

M&S moves to dismiss all claims against it for failure to state a claim for which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). The motion is fully briefed and, after the benefit of oral argument, is ripe for decision. Upon consideration and for the reasons stated below, the motion will be denied.

## **FACTS AND PROCEDURAL HISTORY**

For years, Lonnie Dontae Mitchell (alias "Stryker") ran a sex trafficking operation in the Montgomery, Alabama area. With respect to the Plaintiffs here (Jane Does 1, 2, 4, and 5, or "Does"), Stryker hooked each of them on heroin, which he

---

[1] Doe 3 did not bring a claim against M&S.

would withhold to induce withdrawal as a form of punishment or to coerce them to perform sex acts. He also withheld food as a form of punishment or coercion and physically abused them. Stryker trafficked each of the Does for various amounts of time. Does 1, 4, and 5 were trafficked as adults, and Doe 2 was trafficked as a minor.

Stryker used various hotels in the Montgomery area for his operation. M&S owned and operated one such hotel—the Econo Lodge located at 1401 Eastern Boulevard, Montgomery, Alabama. M&S rented rooms to guests and employed the staff at the hotel, which included housekeeping, maintenance workers, front-desk personnel, and hotel managers.

According to the Does, M&S was aware of the sex trafficking operation. They allege that Stryker and the Does often refused housekeeping when the cleaning staff came to the door and made excessive requests for sheets, cleaning supplies, towels, and room service. They further allege that hotel staff saw what the Does looked like—emaciated, malnourished, bruised, dressed provocatively, drugged, and sometimes exhibiting withdrawal symptoms; witnessed Stryker physically abuse the Does; saw that the Does never left their rooms without an escort and were often with men many years older; saw that the Does stayed in the same rooms together; and saw that the Does' rooms contained condoms, commercial sex and drug paraphernalia, and bodily fluids such as blood. The Does also allege that staff accepted clearly fake IDs when the Does rented rooms, and that the Does and Stryker only paid for their rooms in cash or prepaid gift cards. Then, at times, when Stryker and the Does did not have enough money to extend their stay, staff would allow a late checkout—even into the night—to allow the Does more time to perform additional commercial sex acts to pay for the rooms. Finally, the Does allege that staff regularly moved Stryker and the Does to rooms in the back of the hotel property so that the Does and the sex operation would be less noticeable to other guests.

After a Middle District of Alabama jury convicted Stryker of sex trafficking the Does, the Does sued M&S under the TVPRA, and particular to Doe 2, under a state premises liability claim. In their Complaint, the Does allege that M&S took part in both a hotel operating venture and a sex trafficking venture from which M&S knowingly benefited through room rentals; that M&S knowingly harbored the Does through these room rentals; and that M&S staff knew or were in reckless disregard of the fact that the Does engaged in coerced or forced sex acts.

## JURISDICTION AND VENUE

The Court has original subject matter jurisdiction over the federal issues raised in this case under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367(a). The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint against the legal standard set forth in Rule 8: "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). At this stage, the Court must accept as true all facts alleged in the complaint and construe all reasonable inferences in the light most favorable to the plaintiff. *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Conclusory allegations that are merely "conceivable"

3

and fail to rise "above the speculative level" are insufficient to meet the plausibility standard. *Twombly*, 550 U.S. at 555, 570. This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Indeed, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## DISCUSSION

M&S moves to dismiss all claims against it, arguing the Complaint does not state a claim under the TVPRA or a state-law premises liability claim.

**A.     The TVPRA**

The TVPRA provides sex trafficking victims a civil right of action against those who violate the Act's criminal provisions. *See* 18 U.S.C. § 1595(a). The Act creates two civil theories of liability: liability for those who perpetrate the trafficking themselves ("perpetrator liability") and liability for those who "knowingly benefit" from the perpetrator's actions ("beneficiary liability"). The Does' Complaint invokes both civil liability theories.

    **1.     Count Eleven: Perpetrator Liability**

M&S argues the Does' allegations establish that it was Stryker, not M&S, who forced the Does to engage in commercial sex acts, and therefore the Does' perpetrator liability claim against it fails.

Under the TVPRA, an "individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator . . . ." 18 U.S.C. § 1595(a). A perpetrator is "someone who . . . violated the criminal statute[.]" *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (2021). The relevant criminal section here, 18 U.S.C. § 1591(a), imposes criminal penalties on two categories of people—those who knowingly take action and those who knowingly benefit from another's action:

4

> Whoever knowingly . . . [(1)] recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or . . . in reckless disregard of the fact, that means of force, threats of force, fraud, coercion . . . , or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished . . . .

18 U.S.C. § 1591(a).

Because § 1595 civil perpetrator liability adopts the elements of the invoked criminal provision, the Does' Complaint must plausibly allege facts showing the civil perpetrator's conduct matched the criminal elements of § 1591(a). *See Doe v. Choice Hotels*, No. 6:23-CV-1012, 2024 WL 2955728, at *5 (M.D. Fla. June 12, 2024) (explaining that § 1595 civil perpetrator liability adopts the criminal liability elements of § 1591). The Does argue the facts in the Complaint show that M&S held the requisite knowledge and acted as both types of criminal perpetrators. According to the Does, the Complaint plausibly alleges that M&S is a category one perpetrator because M&S "knowingly harbored" the Does when M&S rented rooms to them and Stryker. (Doc. 1 at 56; Doc. 72 at 10.)[2] M&S argues that no facts show that it knew M&S was harboring the Does in violation of 18 U.S.C. § 1591(a). The Court agrees.

Whether M&S knew it was harboring the Does when it rented rooms to them and Stryker depends on what the term "harbor" means. To "harbor" is "to give

---

[2] The Complaint alleges other prohibited acts under the criminal provision, but these acts are alleged in conclusory fashion; therefore, these will not be accepted as true. *See Iqbal*, 556 U.S. at 678. Further, in their response to M&S's motion to dismiss, the Does only provide an argument that M&S harbored them, while persisting in conclusory statements that M&S also maintained them. (*See* doc. 72 at 10–11.)

5

shelter or refuge to." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 529 (10th ed. 1999)[3]; *Harbor*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/harbor (last visited Jan. 31, 2025). The Does suggest this definition includes room rentals.

The Does point to a single case from a district court within this Circuit in which the court found that a hotel owner and operator *harbored* sex trafficking victims by renting rooms to the victims and their trafficker. In *Doe v. Choice Hotels*, the trafficking victims alleged that the defendant hotel owner/operator was not only aware of the sex trafficking on its premises because it monitored surveillance footage, but also that there was an "understanding between the hotel staff . . . and the traffickers." *See Choice Hotels*, 2024 WL 2955728, at *1 (internal quotations omitted). This understanding enabled the traffickers to operate freely without concealing their actions. *See id.* Looking to other courts' interpretations of the term "harbor," that court found that "providing lodging to someone *for the purposes* of obtaining her labor or services against her will constitutes 'harboring.'" *Id.* at *6 (internal quotations omitted) (emphasis added) (quoting *Mouloki v. Epee*, 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017) (citing *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017))). The court went on to explain that, in the case at hand, the plaintiff

---

[3] "In the absence of a statutory definition of a term, [the Court] look[s] to the common usage of words for their meaning." *Consol. Bank, N.A. v. U.S. Dep't of Treasury*, 118 F.3d 1461, 1464 (11th Cir. 1997). In determining common usage, dictionary definitions provide guidance. *CBS, Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). And so does the context of the whole statute. *Penn v. City of Montgomery*, 381 F.3d 1059, 1062 (11th Cir. 2008) ("We do not look at one word or term in isolation, but instead we look to the entire statutory text." (quoting *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999))). Courts should consult dictionaries from around the time of enactment when determining the plain meaning of a statutory term. *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021). Relevant here, Congress enacted 18 U.S.C. § 1591 as part of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000).

alleged that the hotel operator and trafficker had "entered into a tacit agreement" in which the hotel would provide the trafficker and plaintiffs "a room and shelter whereby [the plaintiffs] could be trafficked for profit." *Id.* This therefore fell within the plain meaning of "harbor," as it was the act of the operator and trafficker agreeing together to harbor the sex trafficking victims through use of the rented hotel rooms. The Does do not make that allegation here.

Regardless, the Court chooses to conduct its own analysis of the plain meaning of "harbor" to determine whether it includes renting a room. The definition of "harbor"—"to give shelter or refuge to"—breaks down further. "Shelter" and "refuge" are easily deciphered. The terms can be synonymous, and both are places of protection or safety from the elements. WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 1622, 1763 (2001). But "to give" has two contextually plausible definitions here: 1) "to present voluntarily and without expecting compensation" or 2) "to pay or transfer possession to another in exchange for something." *Id.* at 808. To determine which definition applies, the Court looks to "the specific context in which [the] language is used[] and the broader context of the statute as a whole." *United States v. Dawson*, 64 F.4th 1227, 1237 (11th Cir. 2023) (cleaned up) (quoting *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality)). The interpretative canon *noscitur a sociis* assists in this endeavor.

*Noscitur a sociis*—a word is known by its associates—is a contextual canon that helps avoid giving meaning to a word that is "so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates*, 574 U.S. at 543 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995)); *Dubin v. United States*, 599 U.S. 110, 124–25 (2023). Under this canon, "a word is given more precise content by the neighboring words with which it is associated." *Dawson*, 64 F.4th at 1237 (internal quotations and citation omitted); *see*

7

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 31, at 195 (2012).

The neighboring verbs here—recruit, entice, transport, provide, obtain, advertise, maintain, patronize, and solicit—are most naturally read in the context of § 1591(a)(1) to connote human trafficking, a modern form of slavery that inherently necessitates luring victims, hiding them away, and forcing them to engage in concealed, nonconsensual conduct.  These neighboring verbs have a common theme; they are actions in which a person does the action to someone else. Or, another common theme, there is no quid pro quo or exchange between people, which would indicate the existence of consent.  *Noscitur a sociis* indicates that "harbor" should be read in a similar manner to its companions. Therefore, the correct definition of "to give" that plugs into the definition of "harbor" here is not the one with the meaning that allows for exchange between people, but the definition that encompasses an action performed by a person to another.  Thus, "to rent a room"—an action that involves the exchange of money for shelter—cannot fall within the plain meaning of "harbor" in this context. *Cf. Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 5:23-CV-235, 2024 WL 4204906, at *5 (E.D. N.C. Sept. 16, 2024) (rejecting that the verb "to harbor" means "to house" in the criminal context of § 1591(a) and rejecting that a hotel "could be liable for 'harboring' under § 1591(a)(1)").  To allow otherwise would give the word *harbor* "unintended breadth" to encompass a meaning that "is inconsistent with [the] accompanying words." *Yates*, 574 U.S. at 543.

Construing the term here, the meaning of "harbor" is to present voluntarily—without expecting compensation—shelter or refuge.[4]  Because M&S did not harbor

---

[4] Also, while a title does not "override the plain words of a statute," it is an available tool when determining the meaning of a statute. *Dubin*, 599 U.S. at 120–21 (internal quotation marks and citation omitted).  Titles are helpful "where [they] reinforce[] what the text's nouns and verbs

the Does by renting rooms to them and Stryker, M&S could not have known it was harboring the Does.  Thus, the Complaint fails to allege facts show that M&S is a category one criminal perpetrator.

The Does next argue their allegations plausibly show that M&S is a category two criminal perpetrator.  The Does do not heavily argue this theory, but their Complaint does allege: "[M&S] rented rooms to aid and facilitate Stryker's sex trafficking of [the Does]."  (Doc. 1 at 2.) They also urge that M&S is liable as a beneficiary because it benefited and assisted Stryker.  And once again, M&S's argument invokes knowledge—it argues that the Complaint's factual allegations fail to show it held actual knowledge that it benefited from participating in a venture with Stryker.

18 U.S.C. § 1591(a) criminalizes knowingly benefiting from participation in a venture.  Pleading as to this theory, the Complaint succeeds.  Under the criminal provision, to "'participat[e] in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection(a)(1)." 18 U.S.C. § 1591(e)(4).  "The term 'venture' means any group of two or more individuals associated in fact[.]" *Id.* § 1591(e)(6). And "'[k]nowledge' is '[a]n awareness or understanding of a fact or

---

independently suggest." *Id.* at 121 (alteration adopted and internal quotation marks and citation omitted). Chapter 77 of Title 18 is titled "Peonage, Slavery, and Trafficking in Persons." Positioned within Chapter 77, § 1591 is itself titled "Sex trafficking of children or by force, fraud, or coercion." These titles are indicators that the statute's words should be read in the context of criminal sex trafficking—not in the context of conventional social or legitimate business activities, such as renting a room. And common sense bolsters the Court's conclusion of the plain meaning of harbor. "[T]here is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward,* 279 U.S. 337, 339 (1929).  A common sense reading of the statute in this criminal context leads one to read "harbor" to mean something akin to "receiv[ing] clandestinely and without lawful authority a person *for the purpose of* so concealing him . . . . It may be aptly used to describe the furnishing of shelter, lodging, or food clandestinely or with concealment." *Harbor*, Black's Law Dictionary (6th ed. 1990) (emphasis added); *see also Harboring*, Black's Law Dictionary (7th ed. 1999) ("[H]arboring [is the] act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien."); *Harboring a Fugitive*, Black's Law Dictionary (12th ed. 2024) ("The crime of affording lodging, shelter, refuge, or other aid to a person seeking to avoid capture or punishment.").

circumstance.'" *Red Roof Inns, Inc.*, 21 F.4th at 723–24 (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019)). Therefore, to classify as a category two perpetrator, M&S must have had knowledge that each time it rented a room to Stryker or the Does, it was "assisting, supporting, or facilitating" Stryker in his violations of 18 U.S.C. § 1591(a). 18 U.S.C. § 1591(e)(4), (6).

The Does' Complaint alleges that M&S staff recognized Stryker and knew that he and the Does were staying at the hotel; saw the sex and drug paraphernalia in the Does' rooms; witnessed the Does' appearances; accepted clearly fake IDs; allowed the Does late checkouts so the Does could perform additional commercial sex acts to pay for rent; and switched the Does to rooms at the back of the hotel where they would be less noticeable to the public and other guests. Drawing on judicial experience and common sense, the reasonable inference these allegations create, *see Hoffman-Pugh*, 312 F.3d at 1225, is that M&S knew 1) Stryker was sex-trafficking the Does on its property, 2) it gained a financial benefit through the Does and Stryker's continuous room rentals, and 3) it was assisting, supporting, or facilitating Stryker in sex trafficking the Does when staff moved the Does' rooms to the back of the hotel, allowed them late checkouts, and allowed them to pay rent late at night after the Does performed additional commercial sex acts. These same allegations, coupled with the allegation that staff witnessed Stryker physically abuse the Does, plausibly establish M&S's knowledge that Stryker used force, threats, or coercion to force the Does to "engage in . . . commercial sex act[s]." 18 U.S.C. § 1591(a).

Accordingly, the Does have sufficiently alleged a plausible claim against M&S as a category two criminal perpetrator who is subject to civil penalties under a civil perpetrator liability theory. M&S's motion to dismiss Count Eleven therefore will be denied.

10

### 2. Count Twelve: Beneficiary Liability

The Does also raise a beneficiary theory claim against M&S under the TVPRA. To state such a claim, the Does must plausibly allege that M&S:

> (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA as to the [Does], and (4) that [M&S] had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the Does.

*Red Roof Inns, Inc.*, 21 F.4th at 719. M&S argues the Does have failed to plausibly allege the first two elements, making it impossible to prove the third and fourth elements.

#### i. Knowingly Benefited

Pointing to the first element, M&S argues "the Complaint fails to plausibly establish M&S knowingly benefited from the alleged sex trafficking venture Stryker was engaged in." (Doc. 42 at 9.) But M&S then proceeds to argue the fourth element—whether the Does have plausibly established M&S's actual or constructive knowledge of a TVPRA violation as to the Does. To this, the Does argue that M&S concedes that the Complaint establishes that M&S knowingly benefited.

Under § 1595(a), "a defendant may benefit" either "financially or by receiving anything of value." *Red Roof Inns, Inc.*, 21 F.4th at 724. To meet the first element of "knowingly benefit," the Does must allege M&S knew it was receiving some value from participating in the alleged venture. *Id.*; *see also Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1165 (N.D. Ala. 2022) ("[T]he 'knowingly benefit' element of section 1595 merely requires that Defendant knowingly receive a financial benefit from its relationship with the sex trafficker." (quoting *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 924 (N.D. Cal. 2021))). Specifically, in the context of hotel operator defendants, courts in this Circuit have found that the defendant knowingly benefited financially when the defendant rented rooms to the

11

trafficker or victims. *See A.D. v. Holistic Health Healing Inc.*, No. 2:22-cv-641, 2023 WL 3004546, at *1, 3 (M.D. Fla. Apr. 19, 2023); *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1234 (N.D. Ga. 2022) ("[T]he rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard.").

The Does' Complaint alleges M&S owned and operated the Econo Lodge and "knowingly benefited" when it "knowingly received payment" each time the Does or Stryker rented a room or extended a checkout so that Stryker and the Does could engage in additional sex transactions. These allegations, taken as true, sufficiently satisfy the first element.

### ii. Taking Part in a Common Undertaking or Enterprise Involving Risk and Potential Profit

The second element of a TVPRA beneficiary claim is the "participation in a venture." 18 U.S.C. § 1595(a). This statutory phrase differs between the criminal and civil provisions. Under the civil provision, "participation in a venture" only requires that a plaintiff allege the defendant "took part in a common undertaking or enterprise involving risk and potential profit." *Red Roof Inns, Inc.*, 21 F.4th at 725. The venture does not have to be a sex trafficking venture. *See id.* at 725–27 (implying that "venture" under Section 1595(a) means *any* venture: "[t]he Does chose to frame the ventures at issue as sex trafficking ventures . . . ."); *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 554 (7th Cir. 2023) (relying on *Red Roof Inns, Inc*, 21 F.4th at 727, and stating, "[T]he Eleventh Circuit has acknowledged[] the alleged venture can be a commercial venture like running or expanding a business." (internal quotations and citations omitted)). Finally, to participate in the venture, one must take action, because "observing something is not the same as participating in it." *Red Roof Inns, Inc.*, 21 F.4th at 727.

M&S is alleged to have participated and benefited from its own hotel operating venture in which it owned, operated, and managed the Econo Lodge, and rented rooms to guests, including the Does and Stryker, for profit.[5] This plausibly establishes that M&S participated in a hotel venture with Stryker when he and the Does rented rooms at the Econo Lodge.

### iii.   The Venture Violated the TVPRA as to the Does

To satisfy the third element, the Does must allege "the venture in which [M&S] participated and from which it knowingly benefited . . . violated the TVPRA *as to the [the Does]*." *Id.* at 725 (emphasis added).

M&S argues that Eleventh Circuit decisions "make clear[] [that] renting rooms to sex traffickers and victims of sex trafficking does not mean a [h]otel venture" violates the TVPRA because the "law requires more" than observing sex trafficking. (Doc. 42 at 14.) M&S is largely correct in this statement. In this Circuit, renting rooms to sex traffickers and their victims *alone* is "not sufficient to establish that [a] defendant participated in a *sex trafficking* venture[,] and observing signs of sex trafficking 'is not the same as participating in it.'" *K. H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *4 (11th Cir. Feb. 9, 2024) (emphasis added) (quoting *Red Roof Inns, Inc.*, 21 F.4th at 726). But the two Eleventh Circuit cases that analyze a TVPRA civil beneficiary claim only explored whether an alleged *sex trafficking* venture violated the TVPRA as to the plaintiffs—not a hotel operating venture. *See Red Roof Inns, Inc.*, 21 F.4th at 727; *Riti*, 2024 WL 505063, at *4.

Here, like their perpetrator liability claim, the Does base their beneficiary liability claim on § 1591(a). And in the context of a hotel operating venture, the

---

[5] The Does also allege that M&S participated in Stryker's sex trafficking venture, which M&S disputes. Because the hotel operating venture satisfies the elements of a beneficiary claim under the TVPRA, the Court need not address whether M&S participated in Stryker's sex trafficking venture.

13

Does' Complaint alleges "more." The same allegations plausibly establishing that M&S is a category two perpetrator under the criminal provision allege more than just hotel staff's observations—those allegations provide affirmative acts showing the hotel operating "venture in which [M&S] participated and from which [M&S] knowingly benefited . . . violated the TVPRA as to the [Does]." *Red Roof Inns, Inc.*, 21 F.4th at 725. The Complaint therefore satisfies the third element.

### iv. M&S Had Constructive or Actual Knowledge That the Undertaking or Enterprise Violated the TVPRA as to the Does

The final element concerns M&S's knowledge. Unlike the criminal provision, a § 1595(a) beneficiary claim only requires the Does to show that M&S had *constructive* knowledge that the venture violated the TVPRA as to the Does. *Id.* To recap, actual "knowledge" requires "[a]n awareness or understanding of a fact or circumstance," *Knowledge*, Black's Law Dictionary (11th ed. 2019), but constructive knowledge "is that knowledge which one using reasonable care or diligence should have," *Red Roof Inns, Inc.*, 21 F.4th at 725 (internal quotations omitted) (quoting *Constructive Knowledge*, Black's Law Dictionary (11th ed. 2019)). Thus, the Does must plausibly allege that M&S at least constructively knew its hotel venture violated the TVPRA as to the Does. *See id.*

M&S's primary dispute concerns this final element. M&S argues that because Does 1, 4, and 5 were adults, they must show M&S's actual or constructive knowledge that these three individuals "engaged in prostitution and solicited prospective buyers . . . against their will." (Doc. 42 at 10 (emphasis omitted).) As to Doe 2, M&S argues that Doe 2 must show that M&S "would have to [have known that] she was a minor or engaging in that behavior against her will to have knowledge [that] she was being trafficked." (*Id.*) According to M&S, the Does failed to plausibly allege the requisite knowledge because sex trafficking is inherently secretive, aims to avoid detection, and the commercial sex and violence occurred

inside the hotel rooms and out of staff's eyesight. M&S urges that because the Complaint does not allege that staff was ever inside the rooms when such activities occurred, the Does cannot establish that M&S knew they were being sex trafficked. M&S also points out that the Complaint lacks specific dates, unlike allegations made against other hotels, of when the Does were trafficked on M&S property. Therefore, according to M&S, Doe 2 cannot plausibly establish that M&S knew she was a minor, especially when the Complaint alleges that the Does used fake IDs to rent rooms.

  M&S's arguments are not persuasive and are better suited for consideration at the summary judgment stage. First, the Complaint alleges sufficient facts to plausibly establish that M&S held constructive knowledge that the hotel venture violated the TVPRA as to all the Does, irrespective of age. Second, while most of the Does' allegations evidence knowledge of *consensual* sex activities or prostitution, there are also allegations that hotel staff witnessed that the Does were bruised, emaciated, either high or experiencing withdrawal, dressed inappropriately for the weather and provocatively, and often wearing dirty clothes; witnessed Stryker verbally and physically abuse the Does; and witnessed Stryker yell and pull the Does back inside if they opened a door too widely. These allegations, at minimum, sufficiently establish that through use of "reasonable care or diligence," M&S should have known that sex trafficking—not prostitution—was occurring on its premises. *Red Roof Inns, Inc.*, 21 F.4th at 725 (internal quotations omitted). Armed with that constructive knowledge, M&S should have known that it was "benefit[ing] . . . financially" from its participation in its hotel venture in violation of the TVPRA as to the Does every time M&S 1) rented rooms to Stryker and the Does, 2) moved the Does' rooms to the back of the hotel, and 3) allowed the Does to pay for room extensions late into the night. 18 U.S.C. § 1591(a)(2). The final element therefore is satisfied.

Because the Complaint's factual allegations, taken as true, establish a plausible civil beneficiary claim under the TVPRA against M&S, the motion to dismiss Count Twelve will be denied.

### B. Count Fifteen: State-Law Premises Liability Claim

Doe 2 alone asserts a state-law premises liability claim against M&S. To assert such a claim, the complaint must allege the same "elements of negligence . . . as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages." *Sessions v. Nonnenmann*, 842 So. 2d 649, 651 (Ala. 2002) (cleaned up). As to this claim, M&S argues only that the Complaint fails to sufficiently allege that M&S owed a duty to Doe 2. According to M&S, because the Complaint does not specifically allege that Doe 2 was an invitee or licensee at the Econo Lodge but instead shows that Doe 2 was a trespasser, M&S owed no more of a duty to Doe 2 than it owed to a trespasser.

Under Alabama law, a hotel operator has the duty to keep its premises safe, *see Robertson v. Travelers Inn*, 613 So. 2d 376, 379 (Ala. 1993), and can be liable for guests' injuries "caused by . . . harmful acts of other guests, patrons, or third persons, if, by the exercise of reasonable diligence, [the owner] could have discovered . . . such acts . . . and could have protected [the] guests or patrons by controlling the conduct of the tortfeasor . . . ." *Carter v. Innisfree Hotel, Inc.*, 661 So. 2d 1174, 1180 (Ala. 1995) (internal quotations and citation omitted). An operator, like any landowner, owes a lesser duty to a trespasser than a licensee or invitee. *See Copeland ex rel. Copeland v. Pike Liberal Arts Sch.*, 553 So. 2d 100, 102 (Ala. 1989). An invitee is someone who is on a "premises for some purpose that materially or commercially benefit[s] the owner . . . of the premises." *Edwards v. Intergraph Servs. Co.*, 4 So. 3d 495, 500 (Ala. Civ. App. 2008) (internal quotations and citation omitted).

While Doe 2 does not allege the specific term "invitee," the factual allegations taken as true plausibly allege that she was one. The Complaint alleges that the "Plaintiffs," which includes Doe 2, paid rent at the Econo Lodge for rooms. (Doc. 1 at 58.) Because the Complaint alleges that Doe 2 rented rooms at the Econo Lodge, the Complaint sufficiently alleges that Doe 2 was on the "premises for some purpose that . . . commercially benefited" M&S. *Edwards*, 4 So. 3d at 500 (internal quotations and citation omitted). Thus, the Complaint plausibly alleges that Doe 2 was not a trespasser, but instead an invitee, and therefore, M&S had a duty to keep its premises safe. *See Copeland*, 553 So. 2d at 102. M&S's motion to dismiss the state-law claim will be denied.

## CONCLUSION

Based on the above, it is **ORDERED** that Defendant M&S Hotels, LLC's *Motion to Dismiss Plaintiffs' Complaint and Brief in Support* (doc. 42) is **DENIED**.

**DONE** and **ORDERED** on this the 25th day of March 2025.

_____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE